**COURT OF CHANCERY**
OF THE
**STATE OF DELAWARE**

TAMIKA R. MONTGOMERY-REEVES
VICE CHANCELLOR

Leonard Williams Justice Center
500 N. King Street, Suite 11400
Wilmington, Delaware 19801-3734

Date Submitted: December 7, 2017
Date Decided: March 29, 2018

Kevin R. Shannon, Esquire
Christopher N. Kelly, Esquire
Andrew H. Sauder, Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
Hercules Plaza, 6th Floor
Wilmington, Delaware 19801

John M. Seaman, Esquire
E. Wade Houston, Esquire
Abrams & Bayliss LLP
20 Montchanin Road, Suite 200
Wilmington, Delaware 19807

> RE: ***Plaze, Inc. & Apollo Aerosol Industries LLC v. Chris K. Callas et al.***
> Civil Action No. 2017-0432-TMR

Dear Counsel:

This letter opinion addresses Defendants' Motion to Dismiss under Court of Chancery Rule 12(b)(6). For the reasons set forth below, the Motion is DENIED.

## I.    Background

All facts are drawn from the Verified Complaint for Injunctive and Other Relief (the "Complaint") and the documents incorporated therein. At this stage of the proceedings, I must take all of Plaintiffs' well-pled facts as true and draw all reasonable inferences in their favor.[1]

---

[1] The Complaint alleges that Defendants shredded a large quantity of documents in the month leading up to their departure and had their third-party IT vendor purge their company emails before their departure. Compl. ¶¶ 41-42. Plaintiffs explained

Plaintiff Plaze, Inc. ("Plaze" or the "Buyer") is a "full-service specialty contract manufacturer of automotive, household, insecticide, and pesticide aerosols."[2] Plaze is the sole member of Plaintiff Apollo Aerosol Industries LLC ("Apollo" or the "Company").[3] In 2015, Plaze acquired Apollo from Defendants (or the "Sellers") for $100,000,000 pursuant to a stock purchase agreement (the "SPA").[4]

The parties signed the SPA on November 24, 2015, and the transaction closed on December 15, 2015.[5] The SPA sets out a mechanism for post-closing adjustments to the purchase price, as well as a limitation on the Sellers' post-closing indemnification liability. The SPA contains representations and warranties by Defendants on behalf of Apollo that are at issue in this litigation.[6] These include representations and warranties about the financial records of Apollo, Apollo's

---

that the Complaint is based primarily on the company emails they were able to recover after the purge. *Id.* ¶ 42; Oral Arg. Tr. 51-52.

[2] Compl. ¶ 9.

[3] *Id.* ¶ 10.

[4] *Id.* ¶ 2.

[5] *Id.* ¶ 23.

[6] *Id.* ¶¶ 63-66; *Id.* at Ex. 1, at 20-35.

compliance with certain laws and contracts, and Apollo's product liability exposure. Indemnification is the sole remedy for a breach of a representation or warranty under the SPA.[7] The SPA also contains several restrictive covenants relevant to this litigation, including non-compete, non-solicit, and confidentiality provisions.[8] The parties agreed that specific performance, an injunction, or other equitable relief are necessary to enforce these provisions of the SPA.[9]

After the closing, Defendants Chris Callas[10] and Maria Callas continued to work at Apollo, but the relationship soured. On March 28, 2016, Apollo and Chris Callas entered into a mutual separation and settlement agreement (the "Separation Agreement") effective March 31, 2016.[11] The Separation Agreement included a severance amount, a repurchase of LLC units, and a settlement of the purchase price under the SPA, as well as additional representations, warranties, and restrictive covenants applicable to Chris Callas.

---

[7]     *Id.* at Ex. 1, § 6.7.

[8]     *Id.* ¶¶ 25-33; *Id.* at Ex. 1, at 53-55.

[9]     *Id.* at Ex. 1, at 61-62.

[10]    At closing, Defendant Chris Callas entered into an employment agreement with Plaintiffs to continue working as CEO of Apollo. *Id.* ¶ 24.

[11]    *Id.* ¶ 35; *Id.* at Ex. 2. Maria Callas also departed Apollo on March 31, 2016. *Id.* ¶ 35.

The heart of the Complaint is Plaintiffs' contention that after the Callases departed Apollo they started a competing business and attempted to solicit employees from Apollo. Plaintiffs also contend that several breaches of representations and warranties, for which Defendants owe them indemnification, came to light during the survival period.

On June 7, 2017, Plaintiffs filed the Complaint seeking to enjoin the competitive behavior of Defendants and compel payment of the indemnification and tax adjustment amounts. Defendants moved to partially dismiss the Complaint on July 7, 2017, and the Court heard oral argument on the Partial Motion to Dismiss on December 7, 2017.

## II. Analysis

The Complaint contains nine counts, eight of which Defendants move to dismiss.[12] These eight counts fall into two broad categories: (1) breaches of restrictive covenants, for which Plaintiffs seek specific performance or injunctive relief, and (2) breaches of representations and warranties, for which Plaintiffs seek indemnification. Counts I through IV allege breaches of restrictive covenants. Counts V through VIII allege breaches of representations and warranties. In support

---

[12] Defendants have not moved to dismiss Court IX, which alleges a breach of Section 6.8 of the SPA related to the tax adjustment amount. *Id.* ¶¶ 132-36.

of their motion to dismiss, Defendants first argue that the subsequent Separation Agreement between Plaintiffs and Defendant Chris Callas settled all claims in Counts V through VIII for breaches of representations and warranties. Second, Defendants argue that the allegations in the Complaint fail to state a claim under Court of Chancery Rule 12(b)(6) as to Counts I through IV and part of Count VIII. I address each argument in turn.

### A.    Standard of Review

When considering a motion to dismiss for failure to state a claim under Court of Chancery Rule 12(b)(6), a court must accept all well-pled factual allegations in the complaint as true, accept even vague allegations in the complaint as well-pled if they provide the defendant notice of the claim, "draw all reasonable inferences in favor of the non-moving party," and deny the motion unless the plaintiff could not recover "under any reasonably conceivable set of circumstances susceptible of proof."[13]

All the claims in this case hinge on the Court's interpretation of the parties' contracts. "Delaware adheres to the 'objective' theory of contracts, *i.e.*, a contract's construction should be that which would be understood by an objective, reasonable

---

[13]    *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002).

third party."[14]  "When interpreting a contract, this Court 'will give priority to the parties' intentions as reflected in the four corners of the agreement,' construing the agreement as a whole and giving effect to all its provisions."[15]  "In giving sensible life to a real-world contract, courts must read the specific provisions of the contract in light of the entire contract."[16]

> **B.     The Separation Agreement Does Not Release Any Indemnification Claims for the Breaches of the Representations and Warranties Alleged in Counts V through VIII as a Matter of Law**

Defendants contend that a provision in the Separation Agreement, when read in the context of, and in conjunction with, the SPA, released any indemnification claims against Defendants arising from the SPA as a matter of law.  Defendants point to Section 6.3(f) of the SPA and Paragraph 4 of the Separation Agreement to support this contention.

Section 6.3 of the SPA governs "Sellers' Indemnification" and lays out a comprehensive indemnification scheme.[17]  Section 6.3(f) of the SPA states: "[a]ll

---

[14]     *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

[15]     *Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014) (quoting *GMG Capital Invs., LLC v. Athenian Venture P'rs I, L.P.*, 36 A.3d 776, 779 (Del. 2012)).

[16]     *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co.*, 166 A.3d 912, 913-14 (Del. 2017).

[17]     *Id.* at Ex. 1, at 41.

indemnification payments under this Section 6.3 shall be deemed adjustments to the Final Purchase Price."[18]  Paragraph 4 of the Separation Agreement states:

> Employee, in his capacity as a Seller (as defined in the Purchase Agreement) and Representative (as defined in the Purchase Agreement), and Plaze hereby agree that the Final Purchase Price (as defined in the Purchase Agreement) and the related purchase price adjustment under Section 2.4 of the Purchase Agreement ("the Final Purchase Price Adjustment") are each set forth on Annex C attached hereto and that such Final Purchase Price and the Final Purchase Price Adjustment shall be final, conclusive, and binding on the parties to the Purchase Agreement.[19]

Defendants argue that Paragraph 4 of the Separation Agreement settled all indemnification payments under Section 6.3 because any indemnification payment must adjust the Final Purchase Price due to Section 6.3(f) of the SPA.  But the Final Purchase Price and Final Purchase Price Adjustment in the Separation Agreement were "final, conclusive, and binding" on the parties, which would make any indemnification adjustment required under Section 6.3(f) impossible.  Thus, any indemnification claims must have been settled by the Separation Agreement.

---

[18]     *Id.* at Ex. 1, at 42.

[19]     *Id.* at Ex. 2, at 2.

In response, Plaintiffs first argue that Defendants' interpretation of Section 6.3(f) of the SPA is incorrect. Plaintiffs point to the United States Supreme Court case *Arrowsmith v. Commissioner*[20] as evidence that Section 6.3(f) merely relates to the parties' intended tax treatment of any indemnification payments. Next, Plaintiffs argue that it would be absurd to read the Separation Agreement to nullify the complex eighteen-month indemnification provisions of the SPA in the way Defendants suggest. Plaintiffs point to the fact that Paragraph 4 of the Separation Agreement explicitly mentions Section 2.4 of the SPA, which governs the Post-Closing Adjustment to the Final Purchase Price, but the Separation Agreement does not mention anything about indemnification or Section 6.3 of the SPA.[21] The Separation Agreement's final paragraph states: "For the avoidance of doubt, nothing contained in this Agreement shall limit, modify, or otherwise affect any party's obligations under the [SPA] . . . ."[22] Thus, Plaintiffs contend nothing in the Separation Agreement evidences the intent of the parties to gut the indemnification provisions of the SPA.

---

[20]     344 U.S. 6 (1952).

[21]     Compl. Ex. 2, at 2.

[22]     *Id.* at Ex. 2, at 4.

In light of Plaintiffs' arguments, Defendants, at best, offer another possibly reasonable interpretation of the contract. While this may entitle them to discovery related to the parties' intentions, it does not entitle them to dismissal as a matter of law at this stage.

Defendants argue in the alternative that, at the very least, the Separation Agreement released Plaintiffs' claims for breach of the financial statement representations and warranties because Section 2.4 includes working capital adjustments, and accounts receivable and accounts payable are both part of the working capital calculation. I agree with Plaintiffs that this argument "conflates the SPA's post-closing working capital adjustment process—i.e., the process for determining a 'final, conclusive, and binding' Final Purchase Price as set forth in Section 2.4 of the SPA—with the parties' right to seek indemnification for breach of representations, warranties, and covenants under Article VI of the SPA."[23] The Motion to Dismiss Counts V through VIII therefore is DENIED.

### C. Plaintiffs Have Pled Sufficient Facts to State a Claim for Breach of the Non-Compete and Non-Solicit Provisions of the SPA

The Complaint contains well-pled facts that state a reasonably conceivable claim that Defendants violated Sections 6.16(b) and 6.16(c) of the SPA, which

---

[23] Pls.' Opp'n Br. 23.

contain the restrictive covenants that prohibit competition and solicitation by Defendants post-closing.

Section 6.16(b) is the restrictive covenant prohibiting post-closing competition. It states:

> Each Seller covenants that during the period commencing on the date hereof and ending on the third anniversary of the date hereof (the "Restricted Period"), other than at the request or direction of Buyer, such Seller shall not, directly or indirectly, invest or own any interest in, manage, control, participate in (whether as an operator, consultant, director, employee, agent, representative or otherwise), consult with, render services for or otherwise engage in any business or entity that competes with the Company Group's businesses as conducted or actively planned to be conducted on the date hereof within any geographic location in which the Company Group operates or actively plans to operate on the date hereof (it being understood that such geographic area currently comprises the United States); provided, however, that nothing in this Section 6.16(b) shall prevent a Seller from being a passive owner of not more than 5% of the outstanding equity securities of any publicly traded entity, so long as such Seller has no active participation in the business of such entity.[24]

Section 6.16(c) is the restrictive covenant prohibiting post-closing solicitation of Apollo employees. It states:

> Each Seller covenants that during the Restricted Period, other than at the request or direction of Buyer, such Seller shall not, directly or indirectly, (i) (x) induce or attempt to

---

[24]     Compl. Ex. 1, at 55.

induce any employee or independent contractor of the Company or any Subsidiary who is employed or engaged by the Buyer Group to leave the employ of the Buyer Group, or in any way knowingly interfere adversely with the relationship between the Buyer Group and any employee thereof or (y) actually hire any employee or independent contractor that is or was, at any time within six months of such proposed hiring, employed by the Buyer Group; (ii) solicit or induce or attempt to solicit or induce any customer, supplier, licensor, licensee or lessor of the Company or any Subsidiary (each a "Business Relation") to cease or refrain from doing business with, or otherwise modify adversely the business done with, the Company or the Subsidiaries; or (iii) in any way knowingly interfere with the relationship (or prospective relationship) between any Business Relation and the Buyer Group. It shall not be a violation of Section 6.16(c)(i)(x) if a Seller makes good faith generalized solicitations for employees (not specifically targeted at employees of the Company Group) through advertisements or search firms.[25]

Plaintiffs have pled the following facts pertaining to Defendants' violations of the non-compete and the non-solicitation agreements. "[I]n early January 2016, Chris Callas, on information and belief, asked another Apollo employee to research whether the company names 'First Brands' and 'Best Brands' were already in use."[26] "Then, in a series of emails throughout January, February, and March 2016, Chris

---

[25]     *Id.*

[26]     *Id.* ¶ 37.

Callas emailed with multiple financial advisors about acquiring new companies and/or opening investment credit lines, noting, for example, 'the truth is I am interest[ed] to buy another company.'"[27] "In addition, in email correspondence throughout February and March 2016, Chris Callas indicated an intention to purchase tanks and/or concrete pads for heptane tanks at some point in the future."[28] Then, days before his departure from Apollo, "[o]n March 16, 2016 . . . [Chris Callas] directed an Apollo employee to circulate technical calculations for a heptane concrete pad in order 'to talk the same language[,]' cautioning 'send it from your cell phone and don't cc me[.]'"[29]

"[I]n the summer of 2016, Chris Callas—through non-party and former Apollo Vice President Richard Wilkinson ('Wilkinson')—bid on used aerosol equipment auctioned off by another chemical company."[30] "Shortly thereafter, Wilkinson began working for SPL, which . . ., in June 2016, registered as a foreign profit corporation in Georgia, with its principal office in Thomaston, Georgia—one

---

[27] *Id.* ¶ 38 (alteration in original).

[28] *Id.* ¶ 39

[29] *Id.* (final two alterations in original).

[30] *Id.* ¶ 47.

mile from the site of a former Apollo manufacturing plant which [Defendants], through their holding company (AMC Upson), owned at that time."[31] "On October 5, 2016, SPL's webpage began indicating that it had a manufacturing plant in Thomaston, Georgia. Shortly thereafter, SPL began leasing equipment for its Thomaston plant."[32]

"In late February and early March 2017, [Defendants]—through AMC Upson—sold the former Apollo manufacturing plant in Thomaston to SPL."[33] Defendants "financed part of SPL's purchase."[34] "Shortly after that sale, Wilkinson, on behalf of his employer, SPL, contacted a major supplier of aerosol propellant tanks about purchasing two 10,000-gallon aerosol tanks."[35]

Over the "Easter holiday in April 2017, Chris Callas invited SPL's Chief Executive Officer, Zachary Colander ('Colander'), to his home. Chris Callas also invited Wilkinson and two current Apollo employees, as well as another Apollo

---

[31]     *Id.* ¶ 48.

[32]     *Id.* ¶ 49.

[33]     *Id.* ¶ 50.

[34]     *Id.*

[35]     *Id.* ¶ 52.

customer, who all attended."[36] "At the Easter dinner, Chris Callas introduced Colander to a current Apollo executive as his 'very dear friend Zach,' and, when discussing SPL's business with Apollo's employees, Chris Callas referred to SPL as 'we,' further indicating his involvement with SPL."[37] "At the same dinner, Colander told an Apollo employee about SPL's plans for the Thomaston site, including that SPL plans to 'run' aerosols and to fill 'anything our customers want.'"[38] "Chris Callas [also] told a current Apollo employee to 'listen to [SPL CEO] Colander,' and that if Colander wants the employee to be his president, then the employee should be his president—even going so far as to shout out salary figures in front of the employee's family."[39]

All of these allegations taken as true make it reasonably conceivable that (1) Defendants, directly or indirectly, invested or owned an interest in, managed, controlled, participated in, consulted with, rendered services for or otherwise engaged in a business or entity that that was competing with Apollo; and (2)

---

[36]    *Id.* ¶ 53.

[37]    *Id.* ¶ 54.

[38]    *Id.* ¶ 55.

[39]    *Id.* ¶ 57 (final alteration in original).

Defendants directly or indirectly attempted to induce an employee of Apollo to leave Apollo. Thus, Plaintiffs have stated a claim that Defendants violated Section 6.16(b) and (c) of the SPA, and the Motion to Dismiss as to Counts I and II is DENIED.

> **D.      Plaintiffs Have Pled Sufficient Facts to State a Claim Against Chris Callas for Breach of the Confidentiality Covenants in the SPA and Separation Agreement**

The Complaint contains well-pled facts that state a reasonably conceivable claim that Chris Callas breached Section 6.16(a) of the SPA and Paragraph 5 of the Separation Agreement. The relevant language of Section 6.16(a) states:

> Upon the request of Buyer at any time after the date hereof, each Seller shall deliver promptly to Buyer or destroy all tangible embodiments (and all copies) of the Confidential Information which are in such Seller's possession or under such Seller's control and provide confirmation thereof in writing.[40]

The relevant language of Paragraph 5 of the Separation Agreement states: "Employee represents, warrants, and covenants that: . . . (v) Employee has returned, or will prior to the Separation Date, return, to the Company all Confidential Information (it being understood that upon execution of this Agreement this representation shall constitute Employee's affirmative confirmation thereof . . . ."[41]

---

[40]      *Id.* at Ex. 1, at 53-54.

[41]      *Id.* at Ex. 2, at 2.

Plaintiffs allege that "[o]n the same day Chris Callas signed the Separation Agreement, he asked an Apollo employee to send him an investor presentation from Apollo's files that, upon information and belief, contained Apollo's Confidential Information."[42] It is reasonable to infer that Chris Callas has not returned all the Confidential Information in his possession, and thus, Plaintiffs have shown that it is reasonably conceivable that Defendants violated Section 6.16(a) of the SPA and Paragraph 5 of the Separation Agreement. The Motion to Dismiss as to Count III against Chris Callas and Count IV is therefore DENIED.

**E. Plaintiffs Have Pled Sufficient Facts to State a Claim Against Maria Callas for Breach of the Confidentiality Covenant in the SPA**

The Complaint contains well-pled facts that state a reasonably conceivable claim that Maria Callas breached Section 6.16(a) of the SPA, which contains the restrictive covenant regarding confidentiality. The pertinent contract language states:

> Each Seller covenants that, from and after the Closing, such Seller shall, and shall cause each of such Seller's Affiliates and representatives to, not disclose, and shall treat and hold as strictly confidential, all Confidential Information and, except as otherwise expressly permitted by this Agreement, refrain from using any Confidential Information (other than for the benefit of the Buyer Group

---

[42]     *Id.* ¶ 45.

as an employee or consultant thereof after the Closing Date).[43]

Plaintiffs have not pled that Maria Callas disclosed any Confidential Information. Plaintiffs have pled, however, that in late March 2016 "Maria Callas emailed from her Apollo business email account to a personal email account a host of Apollo documents containing, among other items, information related to Apollo's accounts receivable and accounts payable."[44] Plaintiffs also pled that shortly before her separation from Apollo, "Maria Callas instructed an Apollo IT manager to send her a critical set of documents containing Apollo's Confidential Information."[45] Taking these facts as true, and considering them in the context of all the facts Plaintiffs have pled, it is, just barely, reasonably conceivable that Maria Callas has used this Confidential Information in violation Section 6.16(a) of the SPA. Plaintiffs have therefore stated a claim for the breach of this restrictive covenant as to Maria Callas, and the Motion to Dismiss as to Count III against Maria Callas is DENIED.

---

[43]     *Id.* at Ex. 1, at 53-54.

[44]     *Id.* ¶ 40.

[45]     *Id.* ¶ 43.

> **F.** **Plaintiffs Have Pled Sufficient Facts to State a Claim Against Defendants for Breach of the Legal Compliance Representation and Warranty**

Defendants only challenge the sufficiency of the allegations related to the alleged breaches of representations and warranties in one paragraph of the Complaint. The paragraph, however, contains well-pled facts that state a reasonably conceivable claim that Defendants breached Section 3.16 of the SPA. Section 3.16 contains Defendants' representations and warranties on behalf of Apollo regarding Apollo's compliance with laws. Section 3.16(a) states:

> (a) Except as set forth on Schedule 3.16(a), the Company Group has complied and is in compliance, in each case, in all material respects, with all applicable laws and no written notices have been received by and no claims have been filed against the Company Group alleging a violation of any such laws. Neither the Company nor any Subsidiary has received any written notice of any violation or any alleged violation of any law. No officer, director, employee, independent contractor, consultant, advisor or agent of the Company Group has been or is authorized to make or receive, and none of the Company Group's officers, directors, managers, employees or, to the Knowledge of the Company, consultants, advisors or agents have made or received, any bribe, kickback payment or other illegal payment at any time with respect to the business of the Company Group.[46]

---

[46]    *Id.* at Ex. 1, at 33.

Plaintiffs plead that "Chris Callas caused Apollo to enter into a fictitious long term lease arrangement with a longtime associate, pursuant to which Apollo paid over $300,000 for copiers that were never delivered to Apollo."[47] The Complaint further alleges that "Chris Callas profited personally from the sham arrangement by receiving all or most of the money Apollo paid for the copiers."[48] Plaintiffs argue that this arrangement constituted a "bribe, kickback payment or other illegal payment," in violation of Section 3.16 of the SPA. Because the Court must deny a motion to dismiss unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof, the Motion to Dismiss as to this claim must be DENIED.

## III. Conclusion

For the foregoing reasons the Motion to Dismiss is DENIED.

**IT IS SO ORDERED**.

Sincerely,

*/s/Tamika Montgomery-Reeves*

Vice Chancellor

---

[47]     *Id.* ¶ 81.

[48]     *Id.*